**The below described is SIGNED.**

**Dated: May 30, 2012**

_____
**JOEL T. MARKER
U.S. Bankruptcy Judge**



_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>DOUGLAS E. BROWN and<br>BARBARA K. BROWN,<br><br>                    Debtors. | Bankruptcy Case No. 09-22961<br><br>Chapter 7 |
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>DOUGLAS E. BROWN and<br>BARBARA K. BROWN,<br><br>                    Defendants. | Adversary Proceeding No. 10-2181<br><br>Judge Joel T. Marker |

**MEMORANDUM DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

In this adversary proceeding, the United States of America seeks a determination that certain tax obligations owed by the Debtor-Defendants are nondischargeable under § 523(a)(1)(C) of the Bankruptcy Code because the Debtors "willfully attempted in any manner to evade or defeat such tax." The matters presently before the Court are three cross-motions for summary judgment filed by the United States, Douglas Brown (Douglas), and Barbara Brown

(Barbara) as well as a motion in limine to exclude evidence filed by Barbara and a motion in limine to strike an affidavit filed by the United States. The Court has carefully reviewed the motions as well as all supporting memoranda, responses, replies, declarations, and exhibits. The Court has also carefully considered the parties' oral arguments. For the reasons set forth in this memorandum decision, the Court will grant Barbara's motion for summary judgment, deny Douglas's motion for summary judgment, and grant the United States's motion for summary judgment as to Douglas.

## I. SUMMARY JUDGMENT STANDARD

"The very purpose of a summary judgment action is to determine whether trial is necessary."[1] Federal Rule of Civil Procedure 56(a), incorporated into this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, makes summary judgment available "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] In applying this standard, the Court "examine[s] the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party."[3]

There is no genuine dispute as to any material fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."[4] The moving party has the burden of establishing that it is entitled to summary judgment,[5] and "[a] party opposing summary judgment must produce more than a scintilla of evidence to survive summary judgment."[6] "A memorandum in opposition to a motion for summary judgment must begin with

---

[1] *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).
[2] FED. R. CIV. P. 56(a); *see also Mauerhan v. Wagner Corp.*, 649 F.3d 1180, 1184 (10th Cir. 2011).
[3] *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte County, Kansas City, Kan.*, 546 F.3d 1299, 1306 (10th Cir. 2008).
[4] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[6] *Loper v. Loper (In re Loper)*, 329 B.R. 704, 707 (10th Cir. BAP 2005).

a concise statement of material facts to which the party contends there is a genuine issue. The responding party must number each disputed fact, refer with particularity to the portions of the record upon which the party relies, and, if applicable, state the paragraph number of [the] movant's disputed fact. Material facts of record that are set forth with particularity in [the] movant's statement of facts and that meet the requirements of [Federal Rule of Bankruptcy Procedure] 7056 are admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."[7]

## II. PROCEDURAL HISTORY

As is often true in § 523(a)(1)(C) cases, the Debtors and the Internal Revenue Service have a long history—in this case dating back nearly 20 years—that ultimately led to the United States filing a complaint in the federal District Court in October 2007 seeking to liquidate the Debtors' income tax liabilities and Douglas's gift tax liabilities and to foreclose on federal tax liens against a ski cabin in Brighton, Utah that was nominally owned by the D.E. Brown Family Trust. The Debtors filed their chapter 7 bankruptcy case on March 30, 2009, one day before the United States's motion for summary judgment was set for hearing before the District Court, and the Debtors received their general order of discharge on July 7, 2009. The United States filed this adversary proceeding on March 4, 2010, and the Court held this action in abeyance until the District Court ruled on the United States's motion, which resulted in the liquidation of the Debtors' income tax liabilities for 1993, 1994, 1995, 1996, 1999, 2001, 2002, and 2005 and Douglas's gift tax liabilities for 1994 and 1995. Given the issue overlap between this adversary proceeding and the District Court suit, the Court then further stayed this action until the District Court tried and ruled on the remaining foreclosure issues. Once the District Court issued its Findings of Fact & Memorandum Opinion (FFMO) on October 11, 2011, the Court set this

---
[7] Local Rule 7056-1(b).

matter for a status conference and established a briefing schedule for the present cross-motions as to dischargeability of the liquidated tax debt.

### III. FACTS

The material facts set forth by the parties, although largely undisputed, contain minimal overlap. For its part, the United States relies heavily on the FFMO issued by the District Court, while the Debtors rely heavily on various declarations, documents, and transcripts. Douglas, who is defending himself without the benefit of counsel, did not actually file a response to the United States's motion for summary judgment; he only filed his own motion and a subsequent reply to the United States's response, both of which are substantially identical to Barbara's own motion and reply. Also, the United States's responses to both Douglas's and Barbara's motions fail to comply with Local Rule 7056-1(b). With all this in mind, the Court makes the following findings of fact:[8]

**A. Brighton Ski Cabin and the D.E. Brown Family Trust**

1. The D.E. Brown Family Trust was created as an irrevocable trust on or about June 22, 1993 with Douglas's brother, Mark Brown, serving as the trustor. Robert Tingey, Barbara's brother-in-law, was named trustee. The beneficiaries of the Trust included Barbara and the Browns' four children. FFMO p. 10, ¶ 21; FFMO p. 39, n. 35.

2. Douglas transferred various assets into the Trust, including stocks, notes, and accounts receivable, and he was the only one to do so. FFMO p. 10, ¶ 22.

3. On or about June 12, 1993, Douglas made an offer to buy the Brighton Ski Cabin and tendered a check as an earnest money deposit in the amount of $5,000. FFMO p. 11, ¶ 2.[9]

---

[8] Any of the findings of fact herein are also deemed to be conclusions of law and conclusions of law herein are also deemed to be findings of fact and shall be equally binding as both.
[9] The District Court finding actually states that "**Douglas and Barbara Brown** made an offer" to buy the property and that "**the Browns** accepted" a subsequent counteroffer. This Court has not been provided with the portion of

4

4. On or about June 22, 1993, the Gilbert Willard Jensen Trust and the Myrna Merrill Jensen Trust executed a warranty deed conveying their respective undivided one-half interests in the Brighton Ski Cabin property to Robert Tingey as trustee of the D.E. Brown Family Trust. FFMO p. 12, ¶ 4.

5. On or about June 22, 1993, Douglas executed a Trust Deed as to the Brighton Ski Cabin naming the Gilbert Willard Jensen Trust and the Myrna Merrill Jensen Trust as beneficiaries, together with a Trust Deed Note in the amount of $200,000 payable to the Jensen trusts with interest at a rate of 7.25% per annum. FFMO p. 12, ¶ 5.

6. The closing statements for the Brighton Ski Cabin purchase reflect that the sellers were the Jensen trusts, the buyer was Douglas, and that there was a balance due to the sellers at closing of $71,857.99. FFMO p. 12, ¶ 7.

7. Douglas obtained from First Security Bank of Utah, N.A., using his own personal funds, a cashier's check payable to Title West in the amount of $78,982.99 to cover the $71,857.99 down payment. FFMO p. 13, n. 10.

8. Subsequent to the June 23, 1993 closing, a second Trust Deed was prepared as to the Brighton Ski Cabin property naming the Jensen trusts as beneficiaries, and Douglas and Robert Tingey as trustee for the D.E. Brown Family Trust as trustors, and appears to have been

---

the transcript or exhibits cited in the FFMO for these statements, but the other undisputed facts cited by the District Court, the United States, and the Browns show only that Barbara's name was typed on two documents related to the cabin purchase – the Earnest Money Sales Agreement/Receipt and the Seller's Counteroffer – neither of which Barbara executed. Her name is also typed on a First Security Bank cashier's check for $78,982.99 that was first presented as Exhibit E to the Second Declaration of Virginia Cronan Lowe filed in support of the United States's response to Barbara's motion for summary judgment. The check says "Douglas E. **or** Barbara K. Brown" in the "For" line. In the Second Declaration of Barbara K. Brown filed as Exhibit 3 to the memorandum in support of motion to exclude evidence, Barbara declares that she was not a signatory on that bank account and that she first became aware that her name was on the check after the United States filed its response to her motion. And in its own initial memorandum in support of its motion for summary judgment, the United States relies on the District Court's finding that the money consisted only of Douglas's personal funds. FFMO p. 13, n. 10. Barbara also testified that she looked at the cabin right before it was purchased. District Court Trial Tr. 4/26/11 a.m. at 300:23-301:1.

5

recorded on July 15, 1993.  FFMO p. 14, ¶ 11.  A second Trust Deed Note was also prepared, adding Robert Tingey as an obligor, again as trustee for the D.E. Brown Family Trust.  *Id.*

9.  Through October 2007, Gilbert Jensen recorded having received 57 payments on the Brighton Ski Cabin obligation, and they came from a variety of sources, most of them closely tied to Douglas including his business Brighton Factor Dealers and employer Sundance Homes.  FFMO pp. 15-16, ¶¶ 16-17.[10]

10. Barbara paid the cabin's utility bills and, for a time, a phone bill.  The Browns also sometimes paid premiums on an insurance policy that was issued in Douglas's name.  FFMO, p. 42.

11. Douglas's brother James Brown purchased the remaining cabin debt owed to the Jensen trusts sometime after November 2007 and ultimately foreclosed on the cabin in November 2009.  FFMO pp. 17-18, ¶¶ 22-24; FFMO p. 56.

12. The District Court concluded "that Douglas Brown manifested an intention that the D.E. Brown Family Trust should not hold the actual beneficial interest in the Brighton Ski Cabin property, and thus a purchase money resulting trust had arisen in favor of Douglas Brown at and after the time of the 1993 purchase.  As a consequence of that purchase money resulting trust, the Browns, not the D.E. Brown Family Trust, held the beneficial interest in the Brighton Ski Cabin property."  FFMO, p. 45.

---

[10] The District Court further found that "[m]any of those payments came directly from the Browns **or** from sources either controlled or directed by Douglas Brown: (1) at least five times, starting with the first two quarterly payments ($5,496) in October 1993 and January 1994, Douglas **or** Barbara Brown made payments directly to the Jensens . . . ."  FFMO pp. 15-16, ¶ 17.  Again, this Court has not been provided with the portion of the transcript or exhibits cited in the FFMO for these statements, which are also obviously written in the disjunctive.  At minimum, it does appear that Barbara Brown may have made at least one payment in October 1997.  *See* Exhibit 5 to Barbara's memorandum in support of motion for summary judgment, Document No. 21.  But in any event, the United States does not effectively dispute Barbara's contention that her nearly sole source of income during these times was a monthly allowance from Douglas.

6

13. The District Court also concluded that the D.E. Brown Family Trust held title to the Brighton Ski Cabin as the nominee of Douglas and Barbara. FFMO, p. 59.

**B. Other D.E. Brown Family Trust Assets**

14. All assets held by the D.E. Brown Family Trust were transferred into the Trust from accounts or entities under Douglas's control. FFMO p. 20, ¶ 34.

15. In February 1994, Douglas transferred 150,000 shares of Multistack International Ltd. stock into a Smith Barney account in the name of the Trust as a "gift" to the Trust. FFMO p. 20, ¶ 35.

16. In a series of transactions between March 1994 and February 1995, the 150,000 shares of Multistack were sold for net aggregate sale proceeds of $173,325.80. FFMO p. 20, ¶ 36. Additional funds, *viz.*, a December 1994 dividend of $3,927 and accrued interest of $1,369.39, were added to the balance of the Smith Barney account. FFMO p. 20, n. 18.

17. From March 1994 through July 1995, a total of $169,662 was transferred to open and fund the Trust's checking account at First Security Bank. FFMO p. 20, ¶ 36. During this same time frame, Mr. Tingey made six payments from this account towards the Brighton Ski Cabin note totaling $32,976. FFMO p. 20, n. 19.

18. On June 7, 1994, the Trust purchased 57,500 shares of Greater Southwest Lodging for $575; on September 8, 1994, the Greater Southwest Lodging stock was exchanged for shares of Great Western Asset Group. FFMO pp. 20-21, ¶ 37. Mr. Tingey consulted Douglas concerning the stock purchase and the exchange. *Id.*

19. At some point, the assets of the Trust included 30,000 shares of Surgical Technologies stock which had been purchased by the Trust and held in its Union Securities account, for which shares it apparently paid $65,000. FFMO p. 21, ¶ 39. Those shares were sold

7

in three transactions for $125,587.50 in net proceeds; and on October 20, 1994, Mr. Tingey caused $125,551.50 of the proceeds to be wired to the Trust's account at First Security Bank. *Id.*

20. On October 24, 1994, the Trust purchased another 30,000 shares of Surgical Technologies stock for $90,000 drawn on the Trust's account at First Security Bank. FFMO p. 21, ¶ 40.

21. In August 1994, Douglas transferred 30,000 shares of Innovus Multimedia Inc. stock to the Trust, which was exchanged in November 1994 for 88,500 shares of Innovus Corporation, which in turn was exchanged for a "reverse 2 for 1 split" for 44,250 shares of Innovus Corporation stock. FFMO p. 21, ¶ 38.

22. The Trust's assets also included 200,000 shares of ALPNET stock which were purchased by the Trust in April 1995 for $25,000. FFMO p. 21, ¶ 41. The ALPNET shares were purchased using Trust funds derived from the prior sale of Multistack shares through the Trust's Smith Barney account, and Mr. Tingey consulted with Douglas before transacting the purchase. FFMO p. 22, ¶ 41. The ALPNET shares were subsequently sold for $196,359.70, less administrative expenses. *Id.*

23. Transactions in shares of Innovus Multimedia, Great Western Asset Group, Surgical Technologies, and ALPNET stock were directly related to the activities of the Wellshire securities entities (*e.g.*, Wellshire Securities (Deutschland) GmbH, Wellshire Services, Inc., Wellshire Securities, Inc.). FFMO p. 22, ¶ 42. The Wellshire entities marketed securities to foreign investors, an activity with which Douglas had been directly employed as a stock broker from 1990 to 1995. *Id.*

24. At the trial in the District Court, Douglas testified that "[his] job at Wellshire Services was to find stock investments for them in privately held companies mostly. And I was

paid, in addition to my cash salary, I was given stock in the amount of five percent of the stock that was ultimately purchased by Wellshire for resale to its German clients." FFMO p. 22, n. 20. Of the Browns' 1993 income, $708,985 was attributable to the value of "the number of shares that I received as a finder basically for those securities from Wellshire Services." *Id.*

25.   With the assent of the trustee, Douglas made use of the D.E. Brown Family Trust and its several bank and brokerage accounts to engage in financial transactions that were largely an extension of his own personal dealings and financial affairs involving the business of the Wellshire entities, and otherwise. FFMO p. 27, ¶ 58.

26.   By October 1994, Douglas and the Wellshire entities, among others, had been named as defendants in civil litigation brought by German investors. FFMO pp. 22-23, ¶ 43. Douglas, the Wellshire entities, and others became the subject of a federal securities fraud investigation that led to federal court supervision over the D.E. Brown Family Trust and the Wrenhaven Trust in early 1995, Douglas's criminal indictment in late 1995, and ultimately Douglas's guilty plea and imprisonment in 1997. FFMO pp. 9-10, ¶¶ 19-20; FFMO p. 23, ¶¶ 44-45.

27.   In May 1995, the Trust purchased 65 shares of Top Knot, Inc. stock for $1,000, also after Mr. Tingey consulted with Douglas. FFMO p. 23, ¶ 46. Top Knot apparently had no connection to the Wellshire entities but was affiliated with a company "that Brighton Factor Dealers was purchasing receivables from." *Id.*

28.   In September 1998, the Trust entered into a stipulation by which it relinquished the proceeds of the sale of the ALPNET shares ($196,359.70) and the Surgical Technologies shares ($225,896) to the United States as restitution to be paid to investors in Wellshire Services

9

in connection with Douglas's criminal proceeding, *U.S. v. Douglas E. Brown, et al.*, Case No. 2:95-CR-245B (D. Utah). FFMO p. 26, ¶ 56.

29. The Brighton Ski Cabin remained on the Trust's books because it was not considered to be related to the Wellshire entities' criminal conduct involving Douglas. FFMO p. 27, n. 25.

### C. Brighton Factor Dealers

30. Brighton Factor Dealers was a dba of the Trust, which bought receivables and then collected them. FFMO p. 24, ¶ 48.

31. The Brighton Factor Dealers business was operated by Douglas from his home with assistance from his sister, Lisa Mollerup. FFMO pp. 23-24, ¶ 47.[11]

32. As a routine matter, Mr. Tingey would forward copies of Brighton Factor Dealers' bank account statements to Douglas. FFMO p. 25, ¶ 52. The same was true of bank account statements for the Trust's accounts. *Id.*

33. Beginning in or about October 1994, Douglas conducted the business of Brighton Factor Dealers through the Trust's accounts in an attempt to shelter that economic activity from Douglas's mounting potential personal civil liability arising out of the Wellshire entities' business. FFMO p. 27, ¶ 58.

---

[11] The District Court further stated that "[t]he Brighton Factor Dealers bank account was funded **by the Browns** through a transfer of $57,500 from **the Browns'** Canadian Union Securities account, $45,000 from the Trust's Wells Fargo account, as well as a $25,000 loan from Mr. Brown." FFMO p. 24, ¶ 47. This Court has not been provided with the exhibits cited in the FFMO for these statements, there is no other reference to the Canadian Union Securities account in the FFMO or otherwise, and the United States has not focused on this statement as a foundation for its summary judgment request.

10

### D. The Wrenhaven Trust

34. The Wrenhaven Trust was another Utah trust entity created by Douglas's brother, Mark Brown, as trustor, with Barbara and the Brown children as beneficiaries and Robert Tingey as trustee. FFMO p. 16, n. 15. There is no indication of when the Wrenhaven Trust was created.

35. Although Mr. Tingey apparently testified that "the Browns" contributed all of the Wrenhaven Trust's assets, Douglas testified that he contributed the Debtors' then-residence on Wrenhaven Lane to the trust. *Id.*

36. That house was later sold, the trust reinvested the sale proceeds in another home that was subsequently sold to one of the Browns' children, and those sale proceeds were also paid into the Wrenhaven Trust. *Id.*

37. The Wrenhaven Trust loaned $100,000 of those proceeds to Todd Holloway, a friend of the Browns, to facilitate Holloway's purchase of residential property on Meadowcrest Road in Holladay, Utah, where the Browns currently reside. *Id.*

38. In lieu of rent, Douglas pays an amount equal to Holloway's mortgage payment directly to Holloway's mortgage company. *Id.*

39. At least 12 payments (many of them interest-only) from December 1997 through October 2000 were made by the Wrenhaven Trust for the note on the Brighton Ski Cabin. FFMO p. 16, ¶ 18.

### E. Tax Returns, Tax Liens, and Liquidation of Tax Liabilities

40. Douglas testified at trial and Barbara testified both at trial and her deposition that they knew they had a duty to pay federal income taxes and that federal income tax returns are due by April 15. Declaration of Virginia Cronan Lowe, Exhibits A and B.[12]

---

[12] There is no statement that Douglas also knew that he had a duty to pay federal gift taxes and file gift tax returns, but he has not challenged this point.

11

41. The Debtors did not timely file their federal income tax returns for 1993, 1994, 1995, 1996, and 1999, but they did timely file their returns for 2001, 2002, and 2005. Douglas did not timely file his gift tax returns for 1994 and 1995. The IRS assessed taxes against the Debtors, issued notices and demand for payment, and filed notices of federal tax liens with the Salt Lake County Recorder's Office. Memorandum in Support of United States' Motion for Summary Judgment, pp. 11-15.[13]

42. On summary judgment in December 2010, the District Court reduced the Debtors' income and gift taxes to judgment. FFMO p. 3.

### F. Barbara Brown and the Family Finances

43. Barbara and Douglas have been married since 1979 and have always filed joint income tax returns. Declaration of Barbara K. Brown in Support of Barbara K. Brown's Motion for Summary Judgment (Barbara Decl.) ¶ 2; Declaration of Douglas E. Brown in Support of Barbara K. Brown's Motion for Summary Judgment (Douglas Decl.) ¶ 3.

44. Douglas was not regularly employed from 1995 through 2000. Douglas Decl. ¶ 25. Barbara was not regularly employed outside the home during the period from 1982 through approximately September of 2000. Therefore, except for $401 in 1983, $2,771 in 1992, and $2,772 in 1994, she did not earn or receive any taxable income during this period. Barbara Decl. ¶ 3.

45. She started working in late 2000 and earned $1,760 for that year. From late 2001 into 2002, Barbara was employed at a small clothing store called SDI, working part-time, one day a week on the proprietor's day off, earning approximately $7.00 an hour. She has since had several other jobs and currently watches her brother- and sister-in-law's children. Barbara Decl.

---

[13] There are no specific citations to the record for these propositions, but the Debtors do not challenge these points except as to Barbara's knowledge of the late filing of the 1993-95 federal income tax returns. And in any event, the uncontroverted facts relating to these issues are set forth in the FFMO at pp. 5-9.

¶ 14; Defendant Barbara Brown's Responses to Plaintiff's First Set of Interrogatories (Barbara Responses) ¶ 2; District Court Trial Tr. 4/26/11 a.m. at 287:7-289:13.

46. From approximately 1982 through approximately 1997, Barbara received an allowance from Douglas of approximately $4,000/month to cover her household expenses and pay debts, including making the house payment on the home on Wrenhaven Lane. Deposition of Barbara K. Brown (Barbara Deposition) 9:15-23; 13:13-25; 14:6-10; Barbara Decl. ¶ 4; Douglas Decl. ¶ 13.

47. During the period from 1983 to 1996, Barbara had no idea what her husband's income was each year. Barbara Deposition 9:7-16, 22-23; Barbara Decl. ¶ 5; Douglas Decl. ¶ 6. Douglas maintained all of the Browns' financial records, including all of his salary records, brokerage account records, and tax records, at the offices of his business, Wellshire Services, Inc. Douglas Decl. ¶ 5.

48. Douglas handled all the family finances and did not review or discuss the family finances or financial records with Barbara. Barbara Decl. ¶ 6; Barbara Deposition 9:7-15; Douglas Decl. ¶¶ 6, 12.

49. Between 1988 and 1995, Charles A. Roe, a CPA and tax accountant, was employed as the Chief Financial Officer of Wellshire Services, Inc., and worked in the same office location as Douglas. Douglas Decl. ¶ 7.

50. From 1988 through 1995, Douglas retained Mr. Roe to prepare the Browns' joint federal income tax returns from the Browns' financial records maintained at the offices of Wellshire Services, Inc. Douglas Decl. ¶¶ 8-10.

51.     Barbara never prepared nor reviewed the Browns' joint tax returns before signing them. She relied on her husband and the tax preparer. Barbara Decl. ¶¶ 6-8; Douglas Decl. ¶¶ 8, 10.

52.     During the period from 1988 through 1995, Barbara believed that joint tax returns had been prepared by Charles Roe and that they were timely filed. Barbara Responses ¶ 2; Barbara Decl. ¶¶ 6-9.

53.     Barbara later understood that the joint returns for the tax years 1993, 1994, and 1995 were amended by a tax accountant employed by Arthur Andersen and were not filed until 1997. Barbara Responses ¶ 2; Barbara Decl. ¶ 12; Douglas Decl. ¶¶ 16-18.

## IV.  DISCUSSION

In relevant part, § 523(a)(1)(C) of the Bankruptcy Code excepts from discharge any debt "for a tax . . . with respect to which the debtor . . . willfully attempted in any manner to evade or defeat such tax." This section includes both a conduct element and a mental state element, and the United States has the burden of proof by a preponderance of the evidence.[14] The conduct element can be satisfied by a debtor's affirmative acts of commission or omission to avoid payment or collection of taxes, and "nonpayment of a tax can satisfy the conduct requirement when paired with even a single additional culpable act or omission."[15] The mental state element is satisfied by showing that (1) the debtor had a duty under the law; (2) the debtor knew he had the duty; and (3) the debtor voluntarily and intentionally violated the duty.[16]

In recognizing that exceptions to discharge are to be strictly construed in debtors' favor, the Tenth Circuit has held that "a debtor's failure to pay his taxes, alone, does not fall within the

---

[14] *Vaughn v. U.S. (In re Vaughn)*, 463 B.R. 531, 541-42, 545 (Bankr. D. Colo. 2011).
[15] *Id.* at 545.
[16] *Id.* at 546; *see also Dalton v. IRS*, 77 F.3d 1297, 1302 (10th Cir. 1996) ("A debtor's actions are willful under § 523(a)(1)(C) if they are done voluntarily, consciously or knowingly, and intentionally.").

14

scope of section 523(a)(1)(C)."[17] However, "nonpayment is relevant evidence which a court should consider in the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes."[18] Furthermore, "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner.'"[19]

The United States does not need to show that the Debtors committed fraud or were "inspired by bad purpose or evil motive,"[20] the attempted evasion does not need to be incredibly large in dollar terms relative to the amount of the tax debt,[21] and "an inability to pay debts in subsequent years is not a defense to previous intentional attempts to evade or conceal one's tax liabilities."[22] The Court also may not grant a partial discharge of whatever amount of the tax debt the Debtors arguably cannot afford to pay in the future; if § 523(a)(1)(C) applies, the entire tax debt is excepted from discharge.[23] But the Court must also view each of the Debtors individually. There is no vicarious or presumed liability under § 523(a)(1)(C) simply because the Debtors are married and filed joint returns, and the United States must separately meet its burden on the conduct and mental state elements as to both Douglas and Barbara.[24]

### A.   Douglas Brown

As a procedural matter, the Court could grant the United States's motion as to Douglas simply for his failure to file an actual response which complies with Local Rule 7056-1(b), thus

---

[17] *Dalton v. IRS*, 77 F.3d at 1301.
[18] *Id.*
[19] *Id.*
[20] *Lynch v. U.S. (In re Lynch)*, 299 B.R. 62, 81 (Bankr. S.D.N.Y. 2003).
[21] *Id.* at 77.
[22] *In re Birkenstock*, 87 F.3d 947, 953 (7th Cir. 1996).
[23] *Lynch*, 299 B.R. at 86-88.
[24] *See, e.g.*, *Birkenstock*, 87 F.3d 947; *Blaker v. U.S. (In re Blaker)*, 205 B.R. 326 (Bankr. M.D. Fla. 1996).

15

permitting the Court to treat all of the United States's properly asserted facts as admitted. But even treating Douglas's motion as a response to the United States's motion and given the United States's noncompliance with Local Rule 7056-1(b) in response to his motion, he still does not effectively dispute the relevant facts and the United States still prevails.

Based on the totality of Douglas's conduct in deciding whether the D.E. Brown Family Trust was merely Douglas's nominee, the District Court concluded as follows:

> Mr. Tingey testified that he understood that Douglas Brown wanted to create the Trust in part 'to set up an entity that would hold some assets separate and apart from him' to protect his assets from creditors. Sheltering personal assets from the lawful claims of creditors is an intention distinguishable in its purpose from the donative intent to transfer assets to a trust entirely for the benefit of others; one need not seek to *protect* personal assets from creditors if one is in fact giving them away without retaining any beneficial interest that a creditor may lawfully reach.
> Moreover, Mr. Brown subsequently parked shares of stock in the Trust's accounts as well as the proceeds of sale of some of those shares, and operated a personal business venture, Brighton Factor Dealers, using the Trust's accounts—account activity wholly controlled by Mr. Brown for which the trustee, Mr. Tingey, afforded Brown free rein. These activities reflect an intention to shelter personal investment activity that is readily distinguishable from a donative intent to 'gift' assets to the Trust solely for the benefit of its beneficiaries . . . .
> In this case, the evidence shows that the Browns created the Trust to shield their assets from their creditors and transferred the Brighton Ski Cabin to the Trust for that purpose, all the while intending to use the Brighton Ski Cabin as their own property . . . . FFMO pp. 53-54, 57.

Based on the totality of Douglas's conduct for purposes of determining nondischargeability under § 523(a)(1)(C), this Court agrees. Douglas purchased the Brighton Ski Cabin in June 1993 using personal funds for the earnest money deposit and down payment as substantial tax liabilities were accruing, transferred the cabin into the D.E. Brown Family Trust, and then continued to treat the property as his own throughout the Trust's nominal ownership

16

while ignoring the formalities of the Trust. He also used the Trust to shelter his Brighton Factor Dealers business activity and to engage in substantial stock trading transactions even after the first of several civil lawsuits was filed against him in October 1994. Combined with the late filing of several returns and the non-payment of the relevant tax liabilities, the Court must conclude that Douglas "attempted in any manner to evade or defeat" those liabilities.

Rather than truly attempting to raise sufficient genuine disputes as to any material facts that would justify the need for a trial, Douglas raises other arguments, some of which were already rejected by the District Court and all of which are unavailing. Issue preclusion applies such that the District Court's supported factual findings are preclusive in this nondischargeability litigation.[25] The District Court has already rejected Douglas's argument alleging lack of knowledge as to his accruing creditor liabilities when the cabin was purchased in June 1993, and in any event this argument does not account for the subsequent Brighton Factor Dealers and stock transaction activity. The fact that the United States was in control of the cabin for a few years is immaterial given that the Trust nominally owned the cabin, which was still in Douglas's constructive possession, for the better part of 16 years from 1993 until 2009. Conversely, the fact that the United States ultimately released control of the cabin is also immaterial because the release was only related to the criminal activities of Douglas and the Wellshire entities. Douglas's alleged net worth as of the date of the cabin purchase is not probative of his attempt to

---

[25] Under Utah law, "[a] party seeking to invoke [issue preclusion] must establish that: (1) the issue decided in the prior adjudication is identical to the one presented in the instant action; (2) the party against whom preclusion is asserted was a party, or in privity with a party, to the prior adjudication; (3) the issue in the first action was completely [or competently], fully, and fairly litigated; and (4) the first suit resulted in a final judgment on the merits." *Buckner v. Kennard*, 99 P.3d 842, 847 (Utah 2004); *see also Brigham Young Univ. v. Tremco Consultants, Inc.*, 110 P.3d 678, 686 (Utah 2005). Although the District Court trial involved several theories for foreclosure of the United States's tax liens against the Brighton Ski Cabin rather than nondischargeability, and claim preclusion would not apply, issue preclusion does apply. The overlapping issues were why this Court held the adversary proceeding in abeyance in the first place, and the Browns were on notice that adverse findings may be used against them in determining nondischargeability. It should also be noted that Robert Tingey has appealed the District Court's decision, but not the Browns themselves.

evade his tax liabilities (assuming there is even adequate factual support for the assertion), and Douglas's present inability to pay the full amount of the tax liabilities cannot absolve his prior conduct. Finally, the United States is not estopped from seeking to collect the tax obligations simply because they did not file the District Court lawsuit until October 2007, and Douglas's citation to footnote 5 of *Dalton v. IRS* is taken out of context; moreover, the Debtors' chapter 7 bankruptcy case was not filed until March 30, 2009, and § 523(a)(1)(C) actions may be brought at any time.

### B. Barbara Brown

Again as a procedural matter, the Court could grant Barbara's motion simply for the failure of the United States's response to comply with Local Rule 7056-1(b), thus permitting the Court to treat all of Barbara's properly asserted facts as admitted. But even ignoring this failure, the United States still does not effectively dispute the relevant facts and Barbara still prevails.

Despite certain imprecise or unclear references to Barbara in the FFMO,[26] the supported facts only show that Douglas controlled the family's finances; Barbara had essentially no independent income during the relevant years; she had no substantial involvement in the cabin purchase even assuming that the First Security Bank cashier's check is considered as admissible evidence;[27] and she had no involvement of any kind with Brighton Factor Dealers, the D.E. Brown Family Trust stock transactions, or the Wellshire entities. The closest things to culpable conduct and willfulness that the United States presents are Barbara's payment of some basic bills

---

[26] For example, the District Court states that "**the Browns** created the Trust to shield **their assets** from their creditors and transferred the Brighton Ski Cabin to the Trust for that purpose, all the while intending to use the Brighton Ski Cabin as their own property." FFMO p. 57. But the established facts in the FFMO and elsewhere in the record do not support such a broad conclusion as to Barbara, at least in the § 523(a)(1)(C) context.

[27] If the Court were required to rule on Barbara's motion to exclude evidence, that motion would be granted. Under the circumstances of this action, the United States's disclosure of the cashier's check was untimely, without substantial justification, and potentially prejudicial—not to mention inconsistent with the United States's own position in its initial memorandum in support of its motion for summary judgment in which the United States relied on the District Court's finding that the money consisted only of Douglas's personal funds.

18

Case 10-02181    Doc 84    Filed 05/31/12    Entered 05/31/12 07:59:45    Desc Main
Document      Page 19 of 20

and possibly a couple of payments on the cabin note with funds from her monthly allowance. Even though the District Court was able to find nominee liability as to Barbara in the foreclosure action, under the totality of Barbara's conduct under § 523(a)(1)(C) and on the spartan facts alleged by the United States even after completing discovery, taking Barbara's deposition, and examining her at trial, the Court sees no meaningful difference between Barbara and the spouses in cases such as *Birkenstock* and *Blaker*.[28]

## V. CONCLUSION

Barbara's motion for summary judgment is accordingly GRANTED, Douglas's motion for summary judgment is DENIED, and the United States's motion for summary judgment is GRANTED as to Douglas. Barbara is directed to prepare an appropriate order granting her motion and dismissing the complaint against her. The United States is directed to prepare an appropriate order granting its motion as to Douglas and denying Douglas's motion, and the United States is also directed to prepare an appropriate judgment as to Douglas.

---

[28] As such, the Court does not need to rule on the United States's motion to strike the affidavit of Barbara's attorney, Douglas J. Parry. But if the Court were required to rule on the United States's motion to strike, that motion would be granted. The affidavit was filed on the eve of oral argument, its evidentiary purpose is unclear, and Mr. Parry's role as a witness would be inappropriate. Mr. Parry himself also stated at oral argument that he essentially filed the affidavit out of frustration with certain allegations made and positions taken by the United States. And if the affidavit were somehow intended to aid in Douglas's defense, even though Douglas is not Mr. Parry's client and to the extent that the District Court had not already considered the allegations contained therein, it does not raise any genuine disputes as to any material facts.

_____**ooo0ooo**_____

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** will be effected through the Bankruptcy Noticing Center to each party listed below.

Virginia Cronan Lowe
U.S. Department of Justice, Tax Division
P.O. Box 683
Ben Franklin Station
Washington, DC  20044-0683
    *Counsel for Plaintiff*

Douglas E. Brown
6226 Meadowcrest Road
Holladay, UT  84121
    *Pro se Defendant*

Douglas J. Parry
Bennett Tueller Johnson & Deere
3165 East Millrock Drive, Suite 500
Salt Lake City, UT  84121
    *Counsel for Defendant Barbara K. Brown*